IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY GAUS,                          )
                                       )
        Plaintiff,                     )
                                       )        Civil Action No.  09-1698
             v.                        )
                                       )
NORFOLK SOUTHERN RAILWAY CO.,          )
                                       )
        Defendant.                     )
                                       )

## <u>**MEMORANDUM OPINION**</u>

CONTI, District Judge.

        Pending before the court is the motion for summary judgment (ECF No. 23) filed by

Defendant Norfolk Southern Railway Company ("NSR" or "Defendant").  Plaintiff Anthony

Gaus ("Gaus" or "Plaintiff") filed this civil action asserting claims under Section 504 of the

Rehabilitation Act of 1973, as amended, 29 U.S.C. §§794 *et seq.* ("Rehabilitation Act"), the

Americans with Disabilities Act of 1990, 42 U.S.C. §§12101 *et seq.* ("ADA"), the ADA

Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("ADAAA"), and the

Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §951 *et seq.* ("PHRA").  After

reviewing the record, considering the submissions of the parties and the undisputed facts of

record, viewing all disputed material facts in plaintiff's favor and drawing all reasonable

inferences in favor of plaintiff, the court concludes that a reasonable jury could not find that

Gaus was substantially limited in the major life activity of working with respect to conduct or

events occurring before January 1, 2009, and therefore, Gaus failed to establish a prima facie

case of disability discrimination with regard to NSR's refusal to allow Gaus to return to work

during calendar year 2008.  On the other hand, with respect to the conduct or events occurring

after 2008, the court concludes that material issues of fact exist precluding summary judgment. Therefore, the court will grant in part and deny in part defendant's motion for summary judgment.

## I. *Factual Background*[1]

Plaintiff's railroad career began in September 1998 when he was hired as a car man by Consolidated Rail Corporation. (Def.'s Concise Stmt. Mat. Facts ("Def.'s CSMF") ¶5, ECF No. 28.) On June 1, 1999, Gaus became an employee of NSR and has been employed by NSR to the present. (Def.'s CSMF ¶6.) NSR, which is headquartered in Norfolk, Virginia, is a transportation company in the business of hauling freight by rail in the eastern and central portions of the United States, and employs approximately 29,000 people. (*Id.* ¶¶3-4.)

Gaus has been employed as a journeyman electrician at the Conway Locomotive Shop from December 2004 through the present. (*Id.* ¶7.) Locomotive electricians are responsible for diagnostics, maintenance and repair of diesel/electrical locomotives. (*Id.* ¶8.) The physical duties of a locomotive electrician require lifting up to 50 pounds, working at different heights, stooping, bending and getting on and off equipment. (*Id.* ¶9.) The electrician job in a locomotive shop is recognized as a safety-sensitive position. (*Id.* ¶10.) The job of electrician in the locomotive shop requires moving on and around moving machinery and involves the operation

---

[1] The facts are largely undisputed except where otherwise noted. The court observes that beginning with paragraph 64 of NSR's Concise Statement of Material Facts (ECF No. 28), Gaus designated several statements as "Disputed," but his proffered facts in support of his "Disputed" designations and the citations to the record do not relate to the subject matter of NSR's statements to which he is responding (ECF No. 34 at 5-9). In Defendant's Reply to Plaintiff's Response to Defendant's Concise Statement of Material Facts (ECF No. 42), NSR points out this discrepancy, and comments that although NSR's concise statement of material facts contains only 119 paragraphs, Plaintiff's response contains 128 paragraphs. NSR notes that in the introduction of Plaintiff's response to Defendant's CSMF, he indicates that he is responding to ECF No. 24; however, that document has been sealed and substituted at ECF No. 28. Plaintiff did not provide a corrected response to Defendant's concise statement of material facts or any explanation for these discrepancies.

of locomotives for diagnostic and other reasons. (*Id.* ¶¶11-12.)  Because the electricians must also operate locomotives in the performance of their duties, the positions are  subject to the rules of the Hours of Service Act, 49 U.S.C. § 20101 et seq., and the Federal Railroad Administration's Drug Testing Program.  (*Id.* ¶13.)

On a number of occasions during Gaus' employment prior to October 2007, various medical conditions caused him to miss work. (*Id.* ¶14.) During the course of his employment, Gaus applied for FMLA leave on seven occasions and was granted leave five times. (*Id.* ¶15.) The conditions for which Plaintiff sought  and was granted FMLA leave, between August 6, 2001 and  September 6, 2006, include ulcerative colitis (*id.* ¶¶16-19), abdominal surgery to repair a hernia (*id.* ¶¶24-27), carpal tunnel syndrome (*id.* ¶¶28-30), and torn ligaments in his left shoulder (*id.* ¶¶33-35).  Plaintiff sought FMLA leave commencing July 30, 2002 through August 6, 2002, for gall bladder surgery, but his request was denied because he had not worked the requisite hours (1,250) during the previous twelve-month period.  (*Id.* ¶¶21-23.) On each such occasion, Gaus underwent a return to work physical at which time he was released to return to work without any restrictions.  (*Id.* ¶¶18, 20, 23, 27, 30, 35.)[2]

Of relevance here is the FMLA leave request submitted by Plaintiff to commence on October 27, 2007.  (*Id.* ¶36.)  The reason given for that leave request was Addison's disease; the leave request was tentatively approved effective October 17, 2007, and that approval was confirmed with the FMLA leave set to expire on October 31, 2007.  (*Id.* ¶¶36-37.)  In support of this particular FMLA leave request, Gaus supplied a medical certification from Dr. Parepolly

---

[2] With regard to paragraphs 16 through 35 of Defendant's Concise Statement of Material Facts, Plaintiff does not dispute the veracity of the statements contained therein, but, disputes these statements "to the extent that prior FMLA leave has no bearing on the present facts."  (Pl.'s Resp. to Def.'s CSMF ¶¶16-35, ECF No. 34.)  In essence, Plaintiff appears to be contesting the materiality of these statements, but offers no factual or other support for his challenge.  As the statements are not otherwise contested, the court deems these statements to be admitted.

who indicated that Gaus was suffering from adrenal insufficiency requiring steroid medications and testosterone deficiency also requiring daily medications. Dr. Parepolly indicated the onset of this condition was October 3, 2007. (*Id.* ¶38.)   Although Dr. Parepolly estimated Gaus could return to work on November 1, 2007, Gaus' own treating physician, Dr. Karen Schogel, did not recommend his actual return until July 23, 2008.  (*Id.* ¶¶39-40.)

During this period between October 17, 2007 and July 23, 2008 and subsequent thereto, Gaus treated for a variety of conditions for which the medical department at NSR requested additional medical information in order to assess the impact of those conditions on his ability to perform the duties of an electrician.  (*Id.*  ¶41.)  Based on an evaluation dated July 8, 2008 from a neurosurgeon, Dr. Gardner, of the UPMC Department of Neurological Surgery, Gaus was treating for pituitary adenoma. (*Id.* ¶42.) In addition, between October 2007 and July 23, 2008, Gaus treated for panhypopituitarism with Dr. Elisabeth Bergman. (*Id.* ¶43.)  Dr. Bergman was unsure if Gaus' symptoms were secondary to panhypopituitarism or chronic parvovirus infection. (*Id.* ¶44.)

Gaus also treated during this time for chronic parvovirus infection with Dr. Abbas. (*Id.* ¶45.)  Dr. Abbas' records from March 18, 2008 were reviewed by the NSR Medical Department. (*Id.* ¶46.)  Dr. Abbas reported in March 2008 that Gaus' parvovirus was complicated by the development of adrenal insufficiency, hypothyroidism and hypogonadism all in October 2007. (*Id.* ¶47.) When evaluated by Dr. Abbas on March 18, 2008, Gaus provided a history that he continued to experience fatigue, sweating, particularly following exertion, flushing of face, neck and upper chest, arthralgia involving several joints, including those of hands, feet and ankles. The pain was constant with the severity ranging from 5 to 8 on a scale of 10.  Gaus experienced abdominal pain and back ache on and off, but this was not new.  He complained of feeling

overheated along with the chills. He described experiencing a fine tremor of his hands for the past several months. (*Id.* ¶48.)

During this time, Gaus suffered from chronic pain involving his joint, hip, low back and abdomen. (*Id.* ¶49.)   His most recent visit for pain prior to Dr. Schogel's return to work document of July 17, 2008 was with Dr. Mathie at Allegheny North Arthritis Center on May 22, 2008, where Gaus presented with ongoing joint pain involving his hands, low back, and hips.  He rated his pain as an 8 out of 10, and fatigue and sleep disturbances at 10 out of 10. (*Id.* ¶50; Def.'s App., Ex. 26.) During this same period, Dr. Mathie recommended additional tests, injection treatment and physical therapy. (Def.'s CSMF ¶51, ECF No. 28.) Gaus was also treating for mild to moderate sleep apnea and had undergone a sleep study on June 25, 2008. (*Id.* ¶52.)

Gaus felt that he was able to return to work in the spring or early summer of 2008.  (Pl.'s App., Ex. 1 at 62, ECF No. 36.)  Dr. Karen Schogel, Gaus' primary care physician, approved Gaus to return to work on July 21, 2008.  (Pl.'s App., Ex. 3, ECF No. 36.)  At that time, Gaus believed he could return to work with no restrictions.  (Pl.'s CSMF ¶6, ECF No. 35.)

Gaus completed a return to work form and had a return to work examination on July 23, 2008. (Def.'s CSMF ¶53, ECF No. 28.)  The physician hired by NSR to examine Gaus provided an opinion that Gaus could return to work without restriction.  (*Id.* ¶54.)  According to Plaintiff, despite two separate medical opinions that Gaus could return to work, one by a physician hired by NSR and the other by Gaus' primary care physician, the NSR medical department felt that the medical evidence was insufficient and that it required more information. (Pl.'s CSMF ¶9, ECF No. 35.)  According to Defendant, the information provided by Gaus and arising out of the July 23, 2008 exam caused the NSR medical department to seek review of Gaus' status before

releasing him to return to work. (Def.'s CSMF ¶55,ECF No. 28.) In a letter dated July 30, 2008, Gaus was advised by Tony Stuart, shop manager and Gaus' supervisor, that the NSR medical department needed additional information. (*Id.* ¶56.)  The medication Gaus reported using on his return to work information was of concern to the medical department. (*Id.* ¶57.)  In partial response to the request for additional records, Dr. Schogel sent a 45-page fax to the NSR medical department on July 31, 2008. (*Id.* ¶58.) On August 18, 2008, a 28-page fax of medical records was sent from Dr. Schogel to NSR.  (*Id.*  ¶59.)  This fax included the same medical documentation previously faxed from Dr. Schogel's office with the addition of lab reports dated August 1, 2008.  (*Id.* ¶60.)

At this point, the NSR medical department felt that it possessed insufficient medical evidence to make an informed decision about whether Gaus could return to work.  (*Id.* ¶61.)  On August 20, 2008, Dr. Lina conducted a comprehensive review of the information which had been received from Gaus' treating and referral physicians, and summarized these findings in the NSR medical records.  (*Id.* ¶¶ 62-63.)

On August 20, 2008, Dr. Lina discussed her summary and preliminary conclusions in a telephone conference with Gaus.  In a letter to Gaus dated August 23, 2008, she identified the additional records he needed to provide.  (*Id.*  ¶64.)[3]  Dr. Lina's telephone conference with Gaus on August 20, 2008, was the only time she spoke to him.  (Pl.'s CSMF ¶46, ECF No. 35.) Thereafter, Dr. Schogel reiterated her position that Gaus could return to work as of August 26, 2008.  (Def.'s CSMF ¶65, ECF No. 28.)  Dr. Elisabeth Bergman had offered a similar opinion on

---

[3] Plaintiff disputes these statements, but his response does not correspond to NSR's statements in paragraph 64, or provide any support for disputing those statements.  (Pl.'s Resp. to Def.'s CSMF ¶64, ECF No. 34.)  Accordingly, the court deems NSR's statements in paragraph 64 admitted for purposes of summary judgment.

August 21, 2008 after evaluating Gaus for pituitary problems.  (*Id.* ¶66.)[4]  Dr. Byers released

Gaus to return to work as of August 21, 2008 without restriction.  (*Id.* ¶67.)  Dr. Paul Gardner

released Gaus with regard to neurosurgical issues as of August 21, 2008.  (*Id.* ¶68.)  A return to

work indicating Gaus could do so without restriction as of August 26, 2008, was also submitted

by Greater Pittsburgh Orthopaedic Associates.  (*Id.* ¶69.)  On August 28, 2008, Dr. Schogel

wrote a letter to the NSR medical department restating her position that Gaus could return to

work without restriction.  (Pl.'s CSMF ¶14, ECF No. 35.)  Between Dr. Lina's August 22, 2008

letter requesting additional information and December 21, 2008, there were communications

between Gaus, the NSR medical department and various physicians, primarily Dr. Schogel.

(Def.'s CSMF ¶70, ECF No. 28.)

On or slightly before January 9, 2009, the NSR medical department believed it finally

had been provided enough medical information to permit Dr. Lina to offer an opinion on Gaus'

request to return to work.  (*Id.* ¶72.)  Dr. Lina, however, still required more information

regarding Gaus' sleep apnea and fatigue.  (Pl.'s App., Ex. 6 at 50, ECF No. 36.)  After

extensively reviewing comprehensive medical information, Dr. Lina concluded that Gaus was

unable to return to his job as an electrician and advised Gaus of that by letter dated January 9,

2009.  (Def.'s CSMF ¶73, ECF No. 28.)  Dr. Lina explained that "[Gaus'] present medical

condition, Chronic Pain, does not permit safe performance of the essential functions of [his]

position and thus is inconsistent with [NSR's] medical guidelines."  (Def.'s App., Ex. 39, ECF

No. 28.)  Dr. Lina had two concerns at that time, based on the available medical evidence:  (1)

Gaus had not "established a suitable record of control and stability of his chronic pain

---

[4] Plaintiff disputes this statement, but his response does not relate, in any way, to NSR's statement or provide any support for disputing NSR's statement.  (Pl.'s Resp. to Def.'s CSMF ¶66, ECF No. 34.) Accordingly, the court deems NSR's statement in paragraph 66 admitted for purposes of summary judgment.

condition"; and (2) Gaus' "frequent narcotics use." (Pl.'s App., Ex. 6 at 52, ECF No. 36.) Dr. Lina's letter made it clear that Gaus was not being dismissed from service and that the medical restriction could be removed if his condition improved. (Def.'s CSMF ¶74, ECF No. 28.) In her letter, Dr. Lina advised Gaus that he could take advantage of opportunities in other positions in the railroad and gave him information about how to pursue those positions. (*Id.* ¶75.)

In response to the decision of Dr. Lina, Gaus' primary care physician, Dr. Schogel, sent a letter dated  January 27, 2009, reiterating her opinion that Gaus was not impaired physically by medications or medical diagnosis and, that in her opinion, no work restriction was required at that time. (*Id.* ¶76.) In order to assure itself that it was making a comprehensive decision based on all available medical information, the NSR medical department through Dr. Lina faxed a questionnaire to Dr. Schogel on January 29, 2009. (*Id.* ¶77.) The questionnaire was completed in part by Dr. Schogel and received by the NSR medical department on February 17, 2009. (*Id.* ¶78.) Dr. Lina's opinion, however, remained that Gaus was medically disqualified from his position as an electrician due to his chronic pain condition and the use of Opana ER, a narcotic medication. (*Id.*  ¶79.) By letter dated February 20, 2009, Dr. Ray Prible advised Gaus that he reviewed Dr. Schogel's answers to the questionnaire which she returned on February 17, 2009, and his recommendation was that he remain medically disqualified. (*Id.* ¶80.)

Gaus was referred to Dr. Laurie Mathie by Dr. Schogel for the ongoing pain involving his hands, low back and both hips.  At the time he saw Dr. Mathie, Gaus was using Voltaren patches, as needed, for pain and taking Ambien.  In the past, he had taken Vicodin, as needed, and Demerol, but experienced hives with the Demerol. (*Id.* ¶81.)[5]

---

[5] Plaintiff disputes this statement, but his response does not relate, in any way, to NSR's statement or provide any support for disputing NSR's statement. (Pl.'s Resp. to Def.'s CSMF ¶81, ECF No. 34.) The court, however, does not deem NSR's statement in paragraph 81 to be admitted as it is not fully supported by Exhibit 26.

NSR viewed Gaus' use of prescribed pain medicine to be a problem throughout 2009 and into 2010, even though Gaus contended he was able to return to work.  (*Id.* ¶82.)[6]  Beginning in December 2008, Gaus treated primarily for his pain at the Advanced Pain Medicine facility, where he came under the care of a number of doctors.  (*Id.* ¶83.)  At his second visit to the Advanced Pain Medicine facility on February 5, 2009, Gaus was taking Lyrica 150 mg twice a day and Opana ER 40 mg every twelve hours.  He reported pain on a scale of 4 out of 10 and his use of Opana was increased to 50 mg every twelve hours.  His primary complaints were pain in the lower back and left abdominal quadrant.  (*Id.* ¶84.)  Dr. Lamperski noted that Gaus tolerated the Opana ER well, and denied any lightheadedness, tiredness, nausea, cognitive difficulty, or constipation.  (Def.'s App., Ex. 44, ECF No. 28-7.)

Gaus returned to the Advanced Pain facility on April 9, 2009, and reported increased pain at that time at a level 6 out of 10. (*Id.* ¶85, ECF No. 28.)  He reported that the Opana ER, even though increased to 50 mg, only helped his pain for six to eight hours.  At this visit, the Opana ER was increased to 70 mg every twelve hours, and Gaus continued to take Lyrica at a dosage of 150 mg. twice a day.  (*Id.* ¶86.)  The office notes indicated that Gaus tolerated the Opana ER well, and he denied any lightheadedness, tiredness, nausea, cognitive difficulty, or constipation. (Def.'s App., Ex. 45,ECF No. 28-7.)

Gaus provided the NSR medical department with a report dated April 5, 2009 from Constance Fischer, Ph.D., a psychologist who performed a neuropsychological evaluation of Gaus during three two-hour sessions in March 2009.  (Def.'s CSMF ¶110, ECF No. 28.)  Dr.

---

[6] Plaintiff disputes this statement, but his response does not relate, in any way, to NSR's statement or provide any support for disputing NSR's statement.  (Pl.'s Resp. to Def.'s CSMF ¶82, ECF No. 34.)  The court, however, cannot deem  NSR's statement in paragraph  82 of its CSMF to be admitted, as that statement is a conclusion best left to the jury.  In addition, the evidence cited by NSR in support of its statement (Def.'s App., Exhibits 44-53, ECF No. 28-7–28-8), when viewed in the light most favorable to Gaus, also supports the conclusion that  Gaus' use of prescription pain medication did not impair his

Fischer noted that at the time of her psychological assessment of Gaus, he was taking Ambien 10 mg, Lopressor 50 mg, Opana 50 mg, Protonix 40 mg, Lyrica 150 mg.  (*Id.* ¶111.)  Dr. Fischer opined that the results of her testing allowed her to "predict[] with a high degree of confidence that [Gaus] would indeed catch up as quickly as anyone else with any changes since he left, and would be as competent as ever."  (Def.'s App., Ex. 54, ECF No. 28-8.)

The opinions expressed by Dr. Fischer in her April 5, 2009 report did not change the NSR medical department's assessment of Gaus' abilities to perform safely the essential functions of his job.  (Def.'s CSMF ¶112.)  As explained in Dr. Lina's April 21, 2009 letter to Gaus, the primary concern of NSR's medical department remained Gaus' use of Opana ER twice daily and Lyrica twice daily for his chronic pain.  (*Id.* ¶113.)  Dr. Lina indicated that the NSR medical guidelines prohibit the use of Lyrica and Opana within eight and twelve hours, respectively, of reporting to work.  (NSR's Position Statement dated 6/30/09 to EEOC, at 4 (Pl.'s App., Ex. 14 at 4 and Ex. 6 attached thereto, ECF No. 36-2).)  Dr. Lina encouraged Gaus to discuss the NSR medical guidelines with his prescribing physician to determine whether an alternative medication regimen would be appropriate.  (Pl.'s App., Ex. 6 attached to Ex. 14.)

Dr. Lina took the position that Gaus could not return to work in any safety-sensitive position with NSR if he was not in compliance with NSR's medical guidelines regarding the use of narcotics and based on an assessment of his chronic pain condition, even if he was released by his doctors.  (Pl.'s App., Ex. 6 at 61-62, ECF No. 36-1.)  The NSR "Medical Department Medication Guidelines for Safety-Sensitive and/or Physically Demanding Positions" provide that the use of Zanaflex is prohibited "while at work or *within a minimum of 6 hours prior to work*"; the use of MS Contin is prohibited "while at work or *within a minimum of 12 hours prior to work*"; the use of Opana ER is prohibited "while at work or *within a minimum of 12 hours prior*

---

ability to perform the duties of an electrician.

to work"; and the use of Lyrica is prohibited "while at work or *within a minimum of 8 hours prior to work*[.]"   (Pl.'s App., Ex. 15 at 1, 4-5, ECF No. 36-2.)   NSR's medical department "Return to Work Information Sheet," provides in relevant part:

> VII.  Medication and Work
>
> A number of medications, both prescription and over-the-counter, may cause side effects such as sedation, sleepiness, weakness, fatigue, and/or impairment of judgment, reflexes, balance and coordination, that can adversely impact individual and co-worker safety.   Individuals occupying positions critical to safe railway operations may not work in safety critical and/or non-sedentary positions (including those positions requiring the operation of equipment or motor vehicles) if they are experiencing such side effects.   In general, narcotics and other controlled substances may not be taken while at work or within a minimum of 6 hours prior to reporting to work (a longer period of time may be warranted for sustained release or longer acting medications) if in a safety critical and/or non-sedentary job.   Those performing only sedentary, non-safety sensitive work should ensure their personal safety, judgment and decision-making abilities are not impaired by medication, either prescription or over-the-counter.   Employees should consult their physician and/or pharmacist to address potential side effects, both individually and combined, of all prescription and over-the-counter medications they are taking.   If there are questions regarding the Medical Department's guidelines for use of specific medications and potential effects upon safe performance of job duties, please consult the Medical Department before returning to work.

(Pl.'s App., Ex. 2 attached to Ex. 14, ECF No. 36-2.)

Dr. Lina testified that to her knowledge, the medical guidelines regarding medications have not changed over time.   (Pl.'s CSMF ¶36, ECF No. 35.)  Dr. Lina could not recall NSR ever allowing anyone in a safety-sensitive position to use narcotic medication outside NSR's guidelines.   (*Id.* ¶37.)   Dr. Lina testified that Gaus would not be approved for his electrician position if his treatment involved medication outside NSR's guidelines.   (*Id.* ¶42.)   Dr. Lina's supervisor, Dr. Ray Prible, NSR's Medical Director, testified that employees would not be

allowed to work if their medication fell outside NSR's guidelines. (*Id.* ¶43.) According to Dr. Lina, the term "safety sensitive position"

> encompass[es] job tasks that would require an individual, for example, to be working around moving equipment, work at heights, performing physical work, operating equipment, and also it would cover those jobs that . . . require commercial driver's licenses and that are otherwise regulated by the Federal Railroad Administration's regulations for hours of service, safety-sensitive employees.

(Pl.'s App., Ex. 6 at 15-16, ECF No. 36-1.) With regard to non-safety sensitive positions, Dr. Lina explained that those jobs would "most commonly fall within the clerical ranks, jobs that involve administrative work sedentary, again, the light-duty work." (*Id.* at 17.)

Gaus returned to the Advanced Pain Medicine facility on May 7, 2009. He rated his pain at that time as 7 out of 10. (Def.'s CSMF ¶87, ECF No. 28.) The office notes indicate that Gaus tolerated the increase in Opana ER to 70 mg well. Gaus reported that he recently discontinued taking the Lyrica as he did not feel he was benefiting from it. (Def.'s App., Ex. 46, ECF No. 28-7.) He did request an increase in the dosage of Opana ER from 70 mg to 80 mg, as the cost of the two medication strengths, i.e., 30 mg and 40 mg, was quite expensive. (Def.'s CSMF ¶88, ECF No. 28.) In light of this request and Plaintiff not noting any significant benefit from the 70 mg dosage, the physician agreed to increase his Opana ER to 80 mg every twelve hours. (*Id.*; Def.'s App., Ex. 46, ECF No. 28-7.)[7] The physician prescribed Zanaflex 4 mg at night and strongly cautioned Gaus regarding possible drowsiness and not to operate heavy machinery until he knows how he responds to this medication. (Def.'s App., Ex. 46.)

Gaus returned to the Advanced Pain Medicine facility on June 24, 2009, at which time he continued to report chronic abdominal pain of 5 on a scale of 10. Since his last visit, he reported

---

[7] Plaintiff disputes this statement, but his response does not relate, in any way, to NSR's statement or provide any support for disputing NSR's statement. (Pl.'s Resp. to Def.'s CSMF ¶88, ECF No. 34.) The evidence cited by NSR supports its statement at paragraph 88. Accordingly, the court deems NSR's

that the least amount of pain he experienced was 4 out of 10, and his highest level was 9 out of 10—this reflects no change in his pain status.  (Def.'s CSMF ¶89, ECF No. 28.)  Plaintiff denied significant improvement from the Opana ER 80 mg and Zanaflex 4 mg, and denied adverse effects from the medication.  (Def.'s App., Ex. 47, ECF No. 28-7)  Gaus indicated an interest in changing medications and the doctor substituted MS Contin at 200 mg twice daily for Opana ER. (Def.'s CSMF ¶90, ECF No. 28.)[8]  Plaintiff was continued on the Zanaflex at that time.  (Def.'s App., Ex. 47, ECF NO. 28-7.)

In late June 2009, Dr. Lina determined that Gaus was medically qualified for sedentary, non-safety sensitive work, which included "[p]rimarily positions in the clerical ranks."  (Pl.'s App., Ex. 6 at 64-65, ECF No. 36-1.)  Based on an email from Dr. Lina, Susan Lafon, NSR's manager of vocational support services, sent a letter dated July 1, 2009, to Gaus, offering to assist him in locating alternative jobs with NSR.  (Pl.'s App., Ex. 16, ECF No. 36-2.)  Dr. Lina contended that she could not release Gaus to safety-sensitive work, such as his electrician position, in late June to early July 2009 because she had not received sufficient information regarding his chronic pain and narcotic medication use.  (Pl.'s CSMF ¶40, ECF No. 35.)  Dr. Lina clarified that Gaus could not be cleared for safety-sensitive work at that time because of a chronic pain condition and medication usage.[9]  (Id.  ¶41.)

---

statement in paragraph 88 admitted for purposes of summary judgment.
[8] Plaintiff disputes this statement, but his response does not relate, in any way, to NSR's statement or provide any support for disputing NSR's statement.  (Pl.'s Resp. to Def.'s CSMF ¶90, ECF No. 34.)  The evidence cited by NSR supports its statement at paragraph 90. Accordingly, the court deems NSR's statement in paragraph 90 admitted for purposes of summary judgment.
[9] Plaintiff points out that in NSR's position statement filed on June 30, 2009, with the EEOC in response to Gaus' charge of discrimination, the only reason provided by NSR for medically restricting him from working as an electrician was his use of Opana ER and Lyrica;  no mention was made by NSR in the body of its position statement  that Gaus had been restricted because of his chronic pain condition.  (Pl.'s CSMF ¶¶31-33, ECF No. 35.)  According to Gaus, this stands in contrast to Dr. Lina's testimony at her deposition that Gaus was also medically disqualified because of his chronic pain condition.  (Pl.'s CSMF

On August 12, 2009, Gaus returned to the Advanced Pain Medicine clinic reporting pain at a level of 3 out of 10, with the worst in the intervening time being an 8 to 9 out of 10. His chief complaint remained chronic right and lower quadrant abdominal pain. (Def.'s CSMF ¶91, ECF No. 28.)[10]  Gaus reported that the pain increased in the evening. (Def.'s App., Ex. 48, ECF No. 28-8.)  He reported that his new medication seemed to be working better than the previous medication. (*Id.*)  Although Gaus admitted to some grogginess and sedation, he was unsure whether the sedation was due to a parvovirus contracted two years ago, his inability to sleep due to the pain, or the pain medication itself. (*Id.*; Ex. 1 at 94, ECF No. 28-2.)  He reported that he only felt sedated and groggy when he was "sitting still" and did not feel tired during activities such as driving and cooking. (Def.'s App., Ex. 48, ECF No. 28-8.)  Gaus reported that the MS Contin lasts approximately eight hours; however, his wife, who accompanied him to the office visit, stated that Gaus was unable to sleep due to "intolerable" pain, and repeatedly asked for an increase in his medication. (Def.'s CSMF ¶93, ECF No. 28.)  Gaus indicated that he was "unsure" if he wanted to increase his pain medication. (Def.'s App., Ex. 48 & Ex. 1 at 96,ECF No. 28-8.)  In spite of the request by Gaus and his wife to increase his pain medication, the physician did not increase the dosage of the MS Contin due to Gaus experiencing grogginess and sedation. (Def.'s CSMF ¶94, ECF No. 28.)

---

¶34, ECF No. 35.)  Although it did not specifically mention Gaus' chronic pain condition in the body of its position statement, NSR maintains that it did indicate that its decision to disqualify Gaus medically was "[b]ased on the information obtained from [Dr. Schogel and Dr. Fischer]," and  that information included numerous notations concerning Gaus' chronic pain. (Position Stmt. at 3, Pl.'s App., Ex. 14; *see also* Def.'s Resp. to Pl.'s CSMF ¶33, ECF No. 41.)  The supporting documents attached to NSR's position statement do include two letters from Dr. Lina in which she mentions Gaus' chronic pain condition.  (Pl.'s App., Exs. 4 & 6 attached to Ex. 14.)

[10] Plaintiff disputes this statement, but his response does not relate, in any way, to NSR's statement or provide any support for disputing NSR's statement.  (Pl.'s Resp. to Def.'s CSMF ¶90.)  The evidence cited by NSR supports its statement at paragraph 90.  Accordingly, the court deems NSR's statement in paragraph 90 admitted for purposes of summary judgment.

Plaintiff testified at his deposition that from February 2009 through August 2009 when he was receiving treatment from the physicians at Advanced Pain Medicine, notwithstanding the pain medication and the pain he was experiencing, he was

> quite sure [he] could have [done his job], because most of [his] pain was at night. And [he] was resuming normal activities at home, [he] was lifting weights two hours a day, bench pressing over 400 pounds, working with the children on a daily basis, driving them back and forth to where they needed to go, plus making periodic repairs on [his] home.

(Def.'s App., Ex. 1 at 97, ECF No. 28-2.)

On September 22, 2009, Gaus was again examined at the Advanced Pain Medicine facility. At that time, he reported his lower abdomen and low back pain at a level of 5 out of 10, and that he was not sleeping due to the pain. Gaus requested an increase in his pain medication. (Def.'s CSMF ¶95, ECF No. 28.) Gaus reported that his pain was worse at night and he had great difficulty in sleeping, and indicated that he was taking Ambien to help fall asleep. He indicated that the relief from the MS Contin 200 mg was lasting four to six hours before the pain returned. (*Id.* ¶96.) Gaus denied any side effects from this medication. (Def.'s App., Ex. 49, ECF No. 28-8.) He did report feeling tired because he was not sleeping, but did not attribute that tiredness to his medication. (Def.'s CSMF ¶96, ECF No. 28.) His prescription for MS Contin was increased with special dosage instructions at 100 mg at 7:00 a.m., 200 mg at 3:00 p.m. and an additional dosage on an as needed basis at 11:00 p.m. (*Id.* ¶97.)

In November 2009, Gaus was referred to Dr. Gregg Weidner at UPMC Mercy for a trial of intrathecal narcotics with an intrathecal catheter for his chronic abdominal pain. (*Id.* ¶98.) At the time of his visit with Dr. Weidner, Gaus was reporting significant intra-abdominal pain with no relief from 500 mg of MS Contin within a 24-hour period. (*Id.* ¶99.) An intrathecal catheter was placed on November 21, 2009 and 75 mg per hour of morphine infused. (*Id.* ¶100.) That

15

trial was not successful and Gaus did not proceed with an implant or other permanent procedure to allow for further intrathecal administration of narcotics.  (*Id.* ¶101.)

Gaus returned to Advanced Pain Medicine for treatment of his chronic pain on January 25, 2010.  (*Id.* ¶102.)  Gaus reported that the intrathecal morphine pump trial had not been successful and that he would like to decrease his dosage of medication.  The dosage was decreased to 60 mg of MS Contin every eight hours.[11]  (*Id.* ¶103; Def.'s App., Ex. 51, ECF No. 28-8.)

On February 23, 2010, Gaus returned to the Advanced Pain Medicine clinic for a follow-up evaluation, at which time he denied any change in character or distribution of his pain or side effects from the medication.  (Def.'s CSMF ¶104, ECF No. 28.)  His pain level was a 4 out of 10.  (Def.'s App., Ex. 52, ECF No. 28-8.)  Gaus indicated that he wanted to taper off his current medication of MS Contin 60 mg every eight hours due to inadequate pain relief, he did not want to be taking narcotic medication.  (*Id.*)  The office notes show that a saliva drug screening performed at his last office visit was positive for morphine, which was appropriate, and Tramadol, which was not appropriate.  (*Id.*)  The results of the drug screening were discussed with Gaus.  He admitted occasionally taking the Tramadol, which had been prescribed by Dr. Weidner at UPMC Mercy for headache pain, along with his MS Contin.  (*Id.*; Def.'s App., Ex. 1 at 104.)  At this time, Gaus' MS Contin was decreased to 30 mg every eight to twelve hours as needed.  (Def.'s CSMF ¶106, ECF No. 28.)  Gaus was again seen at Advanced Pain Medicine on March 29, 2010, at which time his MS Contin was decreased to 15 mg.[12]  (Def.'s App., Ex. 1 at 106, ECF No. 28-2.)

---

[11] NSR states the reduced dosage as  60 mg of MS Contin every twelve hours.  This appears to be a clerical error, as the medical record clearly indicates that the dosage is 60 mg every eight hours.  *See* Advanced Pain Medicine office note dated 1/25/10, Def.'s App., Ex. 51,ECF No. 28-8.

[12] NSR states in paragraph 107 of its CSMF that Plaintiff's MS Contin was reduced to "50" mg on March

On or around June 1, 2010, Dr. Lina was provided with 78 pages of medical information and records concerning Gaus from 2009 through May 2010.  (Def.'s CSMF ¶114, ECF No. 28.)  After reviewing those records, Dr. Lina in a letter dated June 18, 2010, requested additional records primarily from Advanced Pain Medicine.  (*Id.* ¶115.)  In response to Dr. Lina's letter, Richard Plowey, M.D. of Advanced Pain Medicine, sent a letter dated June 28, 2010 to Gaus' primary care physician, Dr.  Schogel.  (*Id.* ¶116.)  In that letter, Dr. Plowey noted that Gaus' last evaluation at Advanced Pain Medicine occurred on June 25, 2010, at which time he reported pain levels of 1 to 2 on a scale of 10 and no worse than 4 to 5.  (*Id.* ¶108.)  Dr. Plowey noted that at the June 25, 2010 visit, Gaus reported increased physical activity, including activities such as lifting and climbing, and his pain level had actually improved to the point that he discontinued all prescription pain medications.  (Def.'s App., Ex. 53, ECF NO. 28-8.)  Dr. Plowey reported that Gaus last took morphine in mid-April 2010, and he discontinued the use of Lyrica in May 2009 and the use of Opana in June 2009.  (Def.'s CSMF ¶¶ 109, 117, ECF No. 28.)   Dr. Plowey opined that based on Gaus' presentation on June 25, 2010, Gaus was "able to return to work full duty without restrictions as tolerated . . . [with] no functional limitations . . .."  (Def.'s App., Ex. 53, ECF No. 28-8.)  Dr. Plowey opined that Gaus "will be able to perform all necessary duties associated with his current [position] as an electrician." (*Id.*)

After reviewing Advanced Pain Medicine records, including the June 28, 2010 report from Dr. Plowey, Dr. Lina in a letter dated July 2, 2010, medically qualified Gaus to work as an electrician.  ((Def.'s CSMF  ¶118, ECF No. 28.)  Gaus returned to work on Monday, July 26, 2010, and has been working since that time.  (*Id.* ¶119.)

---

29, 2010.  This appears to be a clerical error as the deposition testimony cited by NSR clearly states the dosage was reduced to "15 mg."  Dep. of Anthony Gaus at 106 (Def.'s App., Ex. 1, ECF No. 28-2).

## II. *Standard of Review*

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1) *Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)).  An issue is genuine only "if the evidence is such that a reasonable jury

could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. *Discussion*

### A. *Applicability of the ADAAA*

The events allegedly giving rise to Gaus' disability discrimination claim began in July 2008, when he was first released to return to work without restrictions by his primary care physician, and continued through July 2010, when he was finally approved to return to work by the NSR medical department and did, in fact, return to work. During this period, Congress enacted the ADAAA, which became effective on January 1, 2009. Pub. L. No. 110-325, §8, 122 Stat. 3553, 3559 (2008). Of particular relevance here, the ADAAA amends the definition and construction of "disability" under the statute, specifically with respect to the intended scope of the "regarded as" prong of that definition. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 188 n.17 (3d Cir. 2009). Consequently, the question arises whether the ADAAA should be applied retroactively to July 2008. The United States Court of Appeals for the Third Circuit considered this issue in a recent nonprecedential opinion and concluded that the "ADAAA is not retroactively applicable." *Britting v. Sec'y, Dep't of Veterans Affairs,* 409 F. App'x 566, 569 & n.3 (3d Cir. 2011) (noting that its sister circuits which have considered this question have uniformly held that the ADAAA does not retroactively apply) (collecting cases). Because Gaus' disability discrimination claim is predicated on the "regarded as" prong of the definition of disability, which was expanded by the 2008 amendments, retroactive application of the ADAAA would impermissibly increase NSR's liability for past conduct. *See Britting,* 409 F. App'x at 569. Therefore, to the extent Gaus contends the events occurring prior to January 1, 2009 give rise to a claim of disability discrimination, such events and conduct must be analyzed under the

pre-2008 amendments version of the ADA and the decisions construing that statutory language. To the extent Plaintiff's discrimination claim is predicated on conduct and events occurring after January 1, 2009, the ADAAA will be applied.

**B.**     ***Prima Facie Case of Disability Discrimination***

Plaintiff's case is predicated on direct evidence of disability discrimination, as opposed to a claim of pretext, i.e., circumstantial evidence.   In such situations, the *McDonnell Douglas* burden-shifting framework is inappropriate.  *See Synder v. Norfolk S. Ry. Corp.,* 463 F.Supp. 2d 528, 534 (E.D.Pa. 2006).  Here, the parties do not dispute that NSR medically disqualified Gaus for safety-sensitive work because of his chronic pain condition and medication regimen.  Gaus maintains that NSR regarded him as disabled.  Consequently, as in *Snyder,* "NSR's actions do not serve as a pretext to discrimination, but rather, as direct evidence of alleged disability discrimination." *Id.*  Gaus can survive summary judgment by presenting sufficient evidence that a reasonable jury could find demonstrates a prima facie case of discrimination.

To prove a prima facie case of disability discrimination under the ADA, Rehabilitation Act and PHRA,[13]  a plaintiff must establish that he (1) is a disabled person within the meaning of the ADA; (2) is qualified to perform the essential functions of his job, with or without reasonable accommodations, and (3) has suffered an adverse employment action as a result of discrimination.  *Sulima v. Tobyhanna Army Depot,* 602 F.3d 177, 185 (3d Cir. 2010) (citing *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999)); *Gaul v. Lucent Techs., Inc.,*

---

[13] The court's discussion of Plaintiff's ADA claim applies equally to Plaintiff's Rehabilitation Act and PHRA claims.  With respect to Plaintiff's Rehabilitation Act claim, Congress has specifically provided in the Rehabilitation Act that the standards applied under Title I of the ADA (42 U.S.C. §§12111 *et seq.*)*,* and the provisions in Sections 501 through 504, and Section 510 of the ADA (42 U.S.C. §§12201 to 12204 and 12210), are used to determine whether an employee was discriminated against under Section 794.  *See* 29 U.S.C. §794(d).  With respect to Plaintiff's PHRA claim, the court of appeals has held that the "PHRA is basically the same as the ADA in relevant respects, and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'" *Rineheimer v. Cemcolift, Inc.,* 292 F.3d 375,

134 F.3d 576, 580 (3d Cir. 1998).   Under the ADA, an individual is considered disabled if he

has:  "(A) a physical or mental impairment that substantially limits one or more of the major life

activities of such individual; (B) has a record of such impairment; or (C) [is] regarded as having

such an impairment."  42 U.S.C. §12102(2); *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 380 (3d

Cir. 2002).   In the case at bar, Plaintiff is pursuing a disability discrimination claim under both

the (A) and (C) prongs of Section 12102(2).   NSR contends that Gaus failed to establish a prima

facie case of discrimination because he cannot show that he is disabled under either prong.

### 1.  *Conduct or Events Occurring Prior to January 1, 2009*

Gaus argues that NSR regarded him as being unable to return to safety-sensitive work

from July 2008 to July 2010, due to his chronic pain condition and medications, and thus,

regarded him as disabled under prong (C) of the three-pronged definition of disability under

Section 12102(2).   An individual is "regarded as" having a disability if he:

> (1) Has a physical or mental impairment that does not substantially
> limit major life activities but is treated by the covered entity as
> constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits
> major life activities only as a result of the attitudes of others
> toward such impairment; or
>
> (3) Has [no such impairment] but is treated by a covered entity as
> having a substantially limiting impairment.

*Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 187 (3d Cir. 1999) (quoting 29 C.F.R. §1630.2(*l*)

(1996)).  Gaus contends that the first situation is implicated here.

An impairment is defined in the regulations as "[a]ny physiological disorder, or condition

. . . affecting one or more of the following body systems: neurological, musculoskeletal, special

sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive,

382 (3d Cir. 2002) (quoting *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996)).

genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1) (2008).

The regulations define major life activities as "functions such as caring for oneself, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R.

§1630.2(i) (2008).[14]   In the case at bar, Gaus submits that his "regarded as" impairment

substantially limits the major life activity of working. With regard to the major life activity of

working, the regulations provide:

> The term *substantially limits* means significantly restricted in the
> ability to perform either a class of jobs or a broad range of jobs in
> various classes as compared to the average person having
> comparable training, skills and abilities. The inability to perform a
> single, particular job does not constitute a substantial limitation in
> the major life activity of working.

29 C.F.R. §1630.2(j)(3)(i) (2008).  Generally, in determining whether a plaintiff is substantially

limited in a major life activity, the regulations identify three factors that should be considered:

"(i) The nature and severity of the impairment; (ii) [t]he duration or expected duration of the

impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long

term impact of or resulting from the impairment."  29 C.F.R. §1630.2(j)(2)(i)-(iii) (2008).   In

addition to these factors, the court may consider the following factors specifically with regard to

the major life activity of "working":

> (A) The geographical area to which the individual has reasonable
> access;
>
> (B) The job from which the individual has been disqualified
> because of an impairment, and the number and types of jobs
> utilizing similar training, knowledge, skills or abilities, within that
> geographical area, from which the individual is also disqualified
> because of the impairment (class of jobs); and/or

---

[14] The citations to the regulations, in particular, 29 C.F.R. §1630.2, are to the version in effect in 2008 through 2010, which pre-dates the changes to Section 1630.2 resulting from the enactment of the ADAAA.  The amended regulations took effect on May 24, 2011.

> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. §1630.2(j)(3)(ii)(A-C) (2008). "However, a temporary, non-chronic impairment of short duration is not a disability covered by the ADA." *Rinehimer,* 292 F.3d at 380 (citing *McDonald v. Pa. Dep't of Pub. Welfare, Polk Ctr.,* 62 F.3d 92, 96 (3d Cir. 1995)); *see also Sulima,* 602 F.3d at 185 (citing *Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 765 (3d Cir. 2004)) ("A nonpermanent or temporary condition cannot be a substantial impairment under the ADA."). Whether an individual is substantially limited in a major life activity involves a question of fact. *Williams,* 380 F.3d at 763.

In support of its summary judgment motion, NSR focuses on the three factors in Section 1630.2(j)(2) and submits that these factors, when applied to the case at bar, support the conclusion that Gaus' impairments did not substantially limit the major life activity of working up until January 1, 2009. The crux of NSR's argument is that Gaus suffered from a medical condition that was transitory and of a limited duration, and as such, did not substantially limit a major life activity. As evidence of the temporary nature of Gaus' impairments, NSR points to the following facts— Gaus' impairments were temporary, as he was disqualified from work for a definite period of time (April 2009 through July 2010) with no permanent or long-term impact; Gaus returned to work in July 2010 and has continued to work without interruption since that time; and during the relevant period of time, Gaus admits that he was able to drive a car, ride his motorcycle, and hang Christmas lights on his house. In support, NSR relies on *Sulima*, 602 F.3d at 185, and *McDonald* and *Snyder, supra.*

In response, Gaus argues that a reasonable jury could conclude that he is disabled because on the record evidence, the jury could find that NSR regarded him as having an impairment (his chronic pain condition and medication treatment of that condition) that substantially limited him from working. Gaus does not, however, address NSR's argument regarding the temporary, nonpermanent nature of his impairments, but argues that he has offered evidence to show that NSR did not believe he could perform a class of jobs or broad range of jobs as compared to the average person having comparable training, skills, and abilities, for NSR. Gaus submits that evidence that NSR believed he could not perform a broad range or class of jobs is competent evidence of NSR's belief that he could not perform those jobs elsewhere. According to Gaus, NSR's ban on prescription narcotic pain medication not only precluded him from working as an electrician, but also from working in all nonsedentary and safety-sensitive positions with NSR. Given his training as an electrician, Gaus maintains that a reasonable jury could conclude that NSR found him significantly restricted from performing a broad class or range of jobs compared to an average person of similar training, skills and abilities. Because he used prescription narcotic medication to treat his chronic pain condition, Gaus submits NSR regarded him as substantially limited in his activity to work establishing a prima facie case of disability discrimination with regard to NSR's refusal to return him to work during calendar year 2008.

Viewing the facts in the light most favorable to Gaus, and all reasonable inferences therefrom, the court finds that Gaus failed to establish that his impairments were substantially limiting, or that NSR perceived his impairments as substantially limiting, as of December 31, 2008. In construing the terms "substantially limited" and "major life activity," the Supreme Court has emphasized that they must be "interpreted strictly to create a demanding standard for

qualifying as disabled." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197 (2002).[15] Thus, the Supreme Court held "that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Id.* at 198 (citing 29 C.F.R. §1630.2(j)(2)(ii)-(iii) (2001)). Thus, in light of the Supreme Court's directive in *Toyota Motor* and the regulations, in order to be substantially limited in the ability to work, Gaus must show that NSR viewed his chronic pain condition and the use of narcotic medication treatment preventing or severely restricting his ability to perform a class of jobs or broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities, and that this impact was permanent or long-term.  As of December 31, 2008, the evidence of record does not establish either of these requirements.

Instead, the evidence shows that on March 18, 2008, Gaus indicated to Dr. Abbas that he was experiencing abdominal pain and back ache on and off, but was not currently taking any medication for pain associated with these symptoms.  On or about May 23. 2008, Gaus presented to Dr. Mathie with ongoing joint pain involving his hands, low back and hips.  Dr. Mathie's report indicates that Gaus reported using Voltaren patches for pain as needed.  At the time of his return to work physical on July 23, 2008, Gaus reported that he was taking Vicodin as needed for pain.  (Def.'s App., Ex. 27, ECF No. 28-5.)   Based on this information, NSR's medical department requested additional medical information on several occasions (7/30/08 letter from Tony Stuart; 8/20/08 telephone conference between Dr. Lina and Gaus; 8/22/08 letter from Dr.

---

[15] The Supreme Court's decision in *Toyota Motor* has been superseded by the ADAAA, and thus, is no longer good law in those cases where the ADAAA governs a claim of disability discrimination.  Since the ADAAA only took effect on January 1, 2009, *Toyota Motor* is still good law vis-à-vis claims that arose prior to January 1, 2009.

Lina to Gaus) to determine whether Gaus could return to work.  As of the end of 2008, NSR had not made a decision about whether Gaus was medically qualified to return to work.

Gaus' reliance on the correspondence from Dr. Lina and the NSR medical guidelines, to support his argument that NSR believed his impairments prevented him from working in all nonsedentary and safety-sensitive positions, is misplaced to the extent he is claiming disability discrimination for refusing to allow him to return to work in 2008.[16]  Although generally, "an employer's perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim[,]" *Taylor,* 177 F.3d at 188,[17] the record here is devoid of any evidence showing that NSR perceived Gaus was unable to perform a wide range of jobs prior to January 1, 2009.  The first indication that NSR viewed Gaus as medically disqualified from his electrician position was provided in Dr. Lina's January 9, 2009 letter to Gaus.  This decision was not issued until after the end of 2008, and the court does not consider it in determining whether Gaus established a prima facie claim of disability discrimination prior to January 1, 2009.

Similarly, NSR makes the mistake of relying on events occurring after December 31, 2008 to support its argument that Gaus' impairments in 2008 were temporary.  In determining whether Gaus has established a prima facie claim of disability discrimination prior to January 1, 2009, the court does not consider NSR's argument that Gaus was disqualified from work for a definite period of time (April 2009 through July 2010) with no permanent or long-term impact; that Gaus returned to work in July 2010 and has continued to work without interruption since that time; and that during the relevant period of time, Gaus admits that he was able to drive a car, ride his motorcycle, and hang Christmas lights on his house.  In addition, NSR's reliance on

---

[16] The court assumes without deciding that NSR's refusal to return Gaus to work in 2008 constitutes an adverse employment action, but neither party addressed this issue.

[17] 29 C.F.R. pt. 1630, app., §1630.2(j) ("An individual who has a bad back that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working

*McDonald* and *Snyder* is misplaced, as neither decision involved the unique factual situation presented here—an impairment that arose prior to the effective date of the 2008 amendments, and continued well after the effective date.   Although *McDonald* supports the proposition that conditions of limited duration, such as a two-month absence due to a surgical procedure, are not the types of impairments contemplated by the ADA or Rehabilitation Act, it is inapposite to the case at bar, where the duration and severity of Gaus' impairments were not known as of December 31, 2008.   Similarly, *Snyder* is distinguishable because the major life activity implicated there was pumping and circulating blood, not working, and the duration of the impairment was known—nine months.

For the reasons set forth above, the court concludes that Plaintiff failed to offer any evidence of conduct or events dated prior to January 1, 2009, from which a reasonable jury could conclude that NSR believed that Gaus' impairments prevented him from working in a class of jobs or broad range of jobs, or that the impact of his impairments was permanent or long term. Accordingly, the court finds that Gaus failed to establish a prima facie case of disability discrimination with regard to NSR's refusal to allow him to return to work during calendar year 2008.

### 2. *Conduct or Events Occurring After January 1, 2009*

In enacting the ADAAA, Congress rejected the narrow interpretation of disability adopted by the Supreme Court in *Toyoto Motor,* specifically, the Supreme Court's standard regarding "substantially limits," finding that this standard "has created an inappropriately high level of limitation necessary to obtain coverage under the ADA," and directed the EEOC to revise that portion of its regulations which defines "substantially limits" as "significantly restricted" to be consistent with the ADAAA.  ADA Amendments Act of 2008, Pub. L. No. 110-

---

because the individual's impairment eliminates his or her ability to perform a class of jobs.").

325, §2(b)(5) & (6), 122 Stat. 3553, 3554.   Congress further declared that the purpose of the

ADAAA is to convey its intent "that the primary object of attention in cases brought under the

ADA should be whether entities covered under the ADA have complied with their obligations,

and to convey that the question of whether an individual's impairment is a disability under the

ADA should not demand extensive analysis[.]"  *Id.* at §2(b)(5), 122 Stat. at 3554.

In keeping with its intent to construe the definition of disability in favor of broad

coverage, Congress amended the definition of disability, in relevant part, as follows:

(1) Disability

The term "disability" means, with respect to an individual—

. . .

(C) being regarded as having such an impairment (as
described in paragraph (3)).

. . .

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being
regarded as having such an impairment" if the individual
establishes that he or she has been subjected to an action
prohibited under this chapter because of an actual or
perceived physical or mental impairment whether or not the
impairment limits or is perceived to limit a major life
activity.

(B) Paragraph (1)(C) shall not apply to impairments that
are transitory and minor. A transitory impairment is an
impairment with an actual or expected duration of 6 months
or less.

42 U.S.C. §12102(1)(C)(3)(A)-(B).  Thus, effective January 1, 2009, if a plaintiff is proceeding

under the "regarded as" prong to establish a disability, he no longer needs to show that his

impairment substantially limits a major life activity.  29 C.F.R. pt. 1630, app. §1630.2(j) (2011).

With these amendments in mind, the court turns now to NSR's arguments.

### a.    Transitory and Minor Defense

Acknowledging the 2008 amendments to the ADA, NSR argues that Gaus must still

establish that he is a qualified individual with a disability to withstand summary judgment, and

he is unable to do so because his impairment is temporary.  In support, NSR focuses on Dr.

Lina's letters to Gaus and her deposition testimony, as evidence of NSR's subjective view that

Gaus' condition was not permanent.   NSR's subjective views regarding the temporary nature of

his impairment, however, are irrelevant.

The recent EEOC regulations provide that a defense to a claim of disability

discrimination under the "regarded as" prong of the definition of disability is that the perceived

impairment is "transitory and minor."  29 C.F.R. §1630.15(f) (2011).  The regulations provide:

> To establish this defense, a covered entity must demonstrate that
> the impairment is both "transitory" and "minor." Whether the
> impairment at issue is or would be "transitory and minor" is to be
> determined objectively. A covered entity may not defeat "regarded
> as" coverage of an individual simply by demonstrating that it
> subjectively believed the impairment was transitory and minor;
> rather, the covered entity must demonstrate that the impairment is
> (in the case of an actual impairment) or would be (in the case of a
> perceived impairment) both transitory and minor. For purposes of
> this section, "transitory" is defined as lasting or expected to last six
> months or less.

*Id.*   The interpretative guidance provided by the EEOC on Title I of the ADA provides the

following examples, by way of further explanation:

> For example, an individual who is denied a promotion because he
> has a minor back injury would be "regarded as" an individual with
> a disability if the back impairment lasted or was expected to last
> more than six months. Although minor, the impairment is not
> transitory. Similarly, if an employer discriminates against an
> employee based on the employee's bipolar disorder (an impairment

30

> that is not transitory and minor), the employee is "regarded as"
> having a disability even if the employer subjectively believes that
> the employee's disorder is transitory and minor.

29 C.F.R. pt. 1630, App. §1630.15(f) (2011).  Thus, NSR must show that Gaus' chronic pain condition and narcotic medication treatment are objectively transitory *and* minor.  NSR failed to meet this burden.

It is clear from the record evidence that Gaus' impairments lasted more than six months.  At the very latest, on January 9, 2009, Dr. Lina medically disqualified Gaus from his electrician position due to his impairments.  Arguably, the onset of his impairments dates back to July 2008, when Tony Stuart first requested additional medical information from Gaus, which was followed up by Dr. Lina with a phone call and letter in August 2008.  Gaus was not cleared to return to work until July 2010.  Regardless whether the onset was July or August 2008 or January 2009, Gaus' impairments lasted in excess of one year, and the record is devoid of objective evidence that his impairments were transitory under the ADAAA, 42 U.S.C. §12102(3)(B), or the implementing regulation, 29 C.F.R. §1630.15(f)(2011).

### b.  Whether NSR Regarded Plaintiff As Disabled

Next, NSR argues that there is no evidence of record to show that NSR regarded Gaus as disabled.  In support, NSR initially posits that the concept of "substantially limits" is the same whether the employee is proceeding under a claim that he is actually disabled or "regarded as" disabled.  This is a misstatement of the ADA after the 2008 amendments.  As noted above, a plaintiff is no longer required to show that his impairment substantially limits a major life activity if he is proceeding under the "regarded as" prong of the definition of disability; rather, after the 2008 amendments to the ADA, Gaus is simply required to demonstrate that he was

subjected to an adverse action as a result of an actual or perceived physical or mental impairment to be "regarded as" disabled. 42 U.S.C. §12102(3)(A); 29 C.F.R. §1630.2(*l*)(1) (2011).

Gaus proffered evidence that shows he met his burden. Gaus' chronic pain condition and narcotic medication treatment easily satisfy the definition of a physical impairment—"[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. §1630.2(h)(1) (2011). The record evidence shows that Gaus primarily complained of chronic abdominal and lower back pain which his treating physicians at Advanced Pain Medicine attributed to post multiple peritoneal surgeries, and for which he was prescribed various narcotic medications. Gaus suffered from pain involving his joint, hands, and hip. His chronic pain condition clearly affects one or more body systems, and indeed, courts have recognized chronic pain as an impairment. *See, e.g., Arnold v. Janssen Pharm., Inc.,* No. 01 C 8138, 2005 WL 1189596, at *8 (N.D.Ill. May 16, 2005) (undisputed evidence existed that plaintiff was diagnosed with chronic pain syndrome).

In NSR's reply brief, although it admits that Gaus suffered from chronic pain, NSR disputes that Gaus suffered from an impairment within the purview of the ADA. In support of its position, NSR attempts to distinguish the decisions cited by Gaus (for the proposition that chronic pain is an impairment) by focusing on the ultimate issue in those decisions—whether the impairment constituted a disability, i.e., whether plaintiff failed to establish the employer regarded her as having an impairment, or whether the plaintiff's impairment substantially limited his ability to drive and dress himself (Def.'s Reply Br. at 5, ECF No. 40)—rather than focusing

32

on the preliminary issue whether chronic pain is an impairment. However, NSR's bases for distinguishing these decisions are irrelevant. The cited decisions were issued prior to the 2008 amendments to the ADA, and thus, the bases upon which NSR relies in the cited decisions are no longer good law. Similarly, NSR's additional basis that Gaus admitted in his deposition to driving a car, riding a motorcycle, and hanging Christmas lights on his house has no bearing on whether his chronic pain condition is an impairment. Consequently, NSR's argument fails to address Gaus' position and evidence. The court finds that NSR failed to provide any evidence or argument for the court to conclude as a matter of law to dispute that Gaus' chronic pain condition is not an impairment.

Next, as evidence that Gaus was subject to an adverse action as a result of his chronic pain condition and medication regimen, Gaus points to Dr. Lina's January 9, 2009 and April 21, 2009 letters, as well as her deposition testimony regarding why she medically disqualified Gaus from working as an electrician, to show that Dr. Lina medically disqualified him from returning to work as an electrician because of his impairments.

On the other hand, NSR contends the record does not contain any evidence that NSR regarded Gaus as disabled; rather, NSR submits the evidence of record clearly demonstrates that, based upon Gaus' medical records, it determined that he suffered from a temporary medical condition that resulted in his inability to work for a limited period of time. NSR points to Dr. Lina's letter dated April 21, 2009, disqualifying Gaus from the electrician position until such time as his physician can determine an alternative medication regimen within NSR's medical guidelines. NSR argues that by its very nature, this letter implies that NSR considered Gaus' disqualification to be temporary and not related to a disability that substantially limits a major

life activity. This argument reiterates the argument NSR made earlier with respect to the transitory nature of his impairment, which the court found to be unmeritorious.

In further support of its argument that the record evidence does not show it regarded Gaus as disabled, NSR relies on *Snyder v. Norfolk Southern Railway Corp.*, 463 F.Supp. 2d 528 (E.D. Pa. 2006). In that case, the district court granted summary judgment for the employer because the plaintiff failed to show that the employer perceived his medical impairment to "substantially limit" his ability to pump and circulate blood, and because the evidence did not show that the employer viewed his impairment as permanent or having a long-term impact on plaintiff's ability to pump and circulate blood. *Snyder*, 463 F.Supp. 2d at 542. NSR contends that as in *Snyder,* here Dr. Lina merely temporarily disqualified Gaus from his safety-sensitive position until such time as he could perform the essential functions of the job, which is indicative that NSR did not regard Gaus as disabled. NSR's reliance on the *Snyder* decision, however, is misplaced. It is clear from NSR's discussion of *Snyder* in its brief that it believes that the substantially limited standard still applies to the "as regarded" prong of the definition of disability. Because Congress has clearly indicated that the substantially limited language no longer applies to "as regarded" cases, NSR's argument misses the mark. Indeed, *Snyder* was decided in 2006, well before the effective date of the 2008 amendments.

Finally, NSR again reiterates its unavailing argument that the evidence shows that it did not believe the expected duration of Gaus' impairment to be permanent or that the impairment would have a permanent or long-term impact on Gaus. This argument lacks merit for the same reasons stated with regard to NSR's asserted defense to Gaus' claim of disability discrimination under the "regarded as" prong of the definition of disability—that his impairments are transitory.

For the reasons stated above, the court finds that Gaus proffered evidence from which a reasonable jury could find that NSR perceived him to be disabled under the "as regarded" prong of the definition of disability.

### c.     Whether Gaus is "Otherwise Qualified" for the Position of Electrician

NSR next argues that Gaus cannot meet the second prong of his prima facie case because he cannot show that he was "otherwise qualified" for the electrician position.  In particular, NSR contends that Gaus is not a qualified individual with a disability because he poses a direct threat to the health or safety of other individuals in the workplace.   Because NSR's actions were motivated by genuine concerns with worker safety, NSR submits that its medical disqualification of Gaus for his electrician position cannot be deemed prohibited under the ADA.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §12112(a).  A "qualified individual" is defined under the ADA as:

> an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. §12111(8); *see Sch. Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287 n.17 (1987) ("In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question.").  According to the Equal Employment Opportunity

Commission's Interpretive Guidance to its regulations under the ADA, a two-step inquiry is employed to determine whether a person is a qualified individual:

> The first step is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. . . . [T]he second step is to determine whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

29 C.F.R. pt. 1630, App. §1630.2(m) (2011); *see Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 145 (3d Cir. 1998).

The crux of NSR's argument under the "qualified individual" element of a prima facie case is that Gaus cannot perform the essential functions of his electrician position because he poses a direct threat to the safety of other individuals in the workplace. The ADA recognizes a defense to a charge of discrimination for qualifications standards, that otherwise deny a job or benefit to an individual with a disability, which are shown to be job-related and consistent with business necessity. 42 U.S.C. §12113(a). Under the ADA, "'qualification standards' may include a requirement that an individual shall not pose a direct threat to health or safety of other individuals in the workplace." 42 U.S.C. §12113(b), s*ee Mandichak v. Consol. Rail Corp.,* Civ. A. No. 94-1071, 1998 U.S. Dist. LEXIS 23005, *14 (W.D.Pa. Aug. 20, 2008) ("An individual is not a qualified individual with a disability if he or she poses a direct threat to the health or safety of other individuals in the workplace.") (citing 42 U.S.C. § 12113(b); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996)). A "direct threat" is defined under the ADA as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. §12111(3). The regulations explain:

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The

determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. §1630.2(r).[18] Thus, "[w]here the perceived threat to safety arises from an employee's medical condition, determination of whether that condition constitutes a direct threat 'shall be based on reasonable medical judgment that relies on the most current medical knowledge and/or the *best available* objective evidence.'" *Wurzel v. Whirlpool Corp.,* No. 3:09CV498, 2010 WL 1495197, at *8 (N.D. Ohio Apr. 14, 2010) (quoting 29 C.F.R. §1630.2(r)). "The employer bears the burden of proving that an employee . . . poses a direct threat." *EEOC v. Hussey Copper Ltd.,* 696 F.Supp. 2d 505, 520 (W.D.Pa. 2010) (citing *Clark v. SEPTA,* Civ. A. No. 06-4497, 2008 WL 219223, at *10 (E.D. Pa. Jan. 25, 2008)); *see, EEOC v. Chrysler Corp.,* 917 F.Supp. 1164, 1171 (E.D. Mich. 1996), *rev'd on other grounds,* 172 F.3d 48 (6th Cir. 1998).

The district court noted in *Hussey*:

The Supreme Court has further explained that "[t]he exception can only be invoked where a risk is significant: 'because few, if any, activities in life are risk free . . . the ADA does not ask whether a risk exists, but whether it is significant.'" *Doe,* 242 F.3d at 447 (quoting *Bragdon,* 524 U.S. at 649, 118 S.Ct. 2196) (emphasis added). A slightly increased risk, a mere speculative or remote risk is insufficient; there must be a high probability of substantial harm.

---

[18] These factors were originally delineated in *School Board of Nassau County v. Arline,* 480 U.S. 273, 288 (1987) (analyzing the risk of communicating tuberculosis to other workers), *superseded by statute,* 29 U.S.C. § 794(a) (2000).

> 29 C.F.R. § 1630.2(r). In conducting this evaluation, courts and
> entities "must rely on evidence that 'assesses the level of risk' for
> the 'question under the statute is one of statistical likelihood.'" *Id.*
> (quoting *Bragdon*, 524 U.S. at 625, 118 S.Ct. 2196). This
> "rigorous objective inquiry" must be based on medical or other
> objective evidence, applying the four factors set out in *Arline*.
> *Bragdon*, 524 U.S. at 626, 118 S.Ct. 2196; *see also Haas v. Wyo.*
> *Valley Health Care Sys.*, 553 F.Supp.2d 390, 398 (M.D.Pa.2008).
> Relevant here, "a health care professional  . . . [has] the duty to
> assess the risk . . . based on the objective, scientific information
> available to him and others in his profession. His belief that a
> significant risk existed, even if maintained in good faith, [will] not
> relieve him of liability."  *Bragdon*, 524 U.S. at 649, 118 S.Ct.
> 2196.

*Hussey*, 696 F.Supp. 2d at 520.   When the four factors requisite to establish a direct threat in

light of the objective evidence are considered, the court finds that NSR's arguments are based

largely on conclusory statements and speculation.

For example, with regard to the first factor, duration of the risk, NSR submits that the

record evidence establishes that Gaus' severe and chronic pain created a substantial risk that he

would be impaired or distracted.  NSR argues that his medication regimen created a substantial

risk of impairment if he was working within eight or twelve hours of taking Opana ER or Lyrica,

as prescribed.  From this, NSR concludes that the period of incapacitation would be long enough

to create a risk that Gaus could pose a substantial danger to himself or others.  NSR, however,

failed to identify any objective evidence in the record that establishes Gaus' chronic pain and

medication regimen created a significant risk that he would be impaired or distracted. NSR

sidesteps the pertinent analysis—whether Gaus was experiencing any side effects from his

medications that affected his ability to function in his job—which is necessary to show Gaus'

impairments posed a significant risk. Moreover, as discussed *infra*, merely referring to NSR's

generally applicable medication guidelines, without any consideration of how a particular

employee is affected by the medications, does not provide the individualized assessment required under the ADA.

With respect to the second factor, NSR contends the evidence here shows that the severity of harm was great. In support, NSR points to the duties of the electrician position, which require moving on and around moving machinery and operating diesel locomotives. Although not cited by NSR, this statement is supported by the affidavit of Tony Stuart (Def.'s App., Ex. 4, ECF No. 28-2), and by the job description for an electrician (Def.'s App., Ex. 5, ECF No. 28-2). The court will concede that if Plaintiff were in fact impaired while at work in this job he could be severely harmed or could severely harm others.  NSR, however, did not provide objective evidence to show the link between Gaus' medication use and his being impaired while at work.

The third factor, the likelihood that the potential harm will occur, was not established. NSR argues that the evidence of record establishes that the risks associated with Plaintiff performing his duties while taking Opana ER and Lyrica were "very real" and "likely to result in potential harm." (*Id.* at 17-18.)  Again, this argument presumes that the objective evidence shows that Gaus' impairments posed a significant risk.  NSR failed to identify exactly what objective evidence in the record supports its position that the likelihood of potential harm was very real, and instead, cites *Wurzel,* 2010 WL 1495197, at *9, for the proposition that the calculation for likelihood of potential harm "is not subject to scientific measurement," or the same as certainty, and that an "employer need not wait to respond to risk of harm until someone is hurt."  NSR did not address evidence to show a significant risk of harm exists or that the likelihood of that harm occurring is substantial.

For similar reasons, the court finds no merit to NSR's argument regarding the fourth factor.  NSR submits that the record evidence shows that the risk of potential harm while Gaus

was taking Opana ER and Lyrica was imminent.  NSR further submits that because his job required him to be constantly on or around heavy, moving diesel locomotive engines, the potential for Gaus to injure himself or someone else while performing his job under the influence of Opana ER and Lyrica was imminent.  In support of this contention, NSR cites *Wurzel* for the proposition that "[w]hile the risk of injury in this case might not have been in every instance and at every moment immediate, it was sufficiently likely to occur that at any given moment it might have been imminent, as the law understands that term in this context."  2010 WL 1495197, at *9. NSR does not indicate how the cited proposition from *Wurzel* applies to this case.  Indeed, the court finds that *Wurzel* is distinguishable, because in that case, the plaintiff suffered from Prinzmetal angina, which caused coronary artery spasms without warning.  *Id.* at *1.  Unlike *Wurzel,* the objective evidence here does not suggest that the risk of injury was sufficiently likely to occur at any given moment, i.e., that Gaus would have suddenly become impaired or distracted due to his chronic pain condition and medication regimen.  NSR's argument might have some merit if it offered objective evidence to show Gaus was experiencing side effects from his medications that would impair his ability to function in his job.  This kind of evidence, however, is absent from the record.

In a further attempt to convince this court that its direct threat argument has merit, NSR cites three decisions which it maintains are factually similar to the case at bar.  As explained below, however, NSR's reliance on these decisions is misplaced.  Although the plaintiff in *Hajel v. Allegheny Ludlum,* No. 2:10cv137, 2010 WL 2103923 (W.D.Pa. May 25, 2010), was forced to take medical leave after the employer's physician determined, during his annual physical, that he could not safely perform his job duties as a laborer in a steel mill because of narcotic medications (Hydrocodone and OxyContin) he used to control his pain, he was allowed to return

to work four months later "after an independent physician confirmed that [he] was able to safely perform his job duties *while taking the required medication to control the pain* related to his physical impairments." *Id.*, at *2 (emphasis supplied).   Moreover, the sole issue in *Hajel* was whether placing an employee on medical leave was alone sufficient to show that the employer perceived its employee as substantially limited in one or more major life activities.   *Id.*, at *4. Thus, the court in *Hajel* was not faced with the issue presented here—whether the employer's disqualification of the employee was based on a direct threat of substantial harm to the health or safety of himself or others.   Therefore, the court finds that NSR's reliance on *Hajel* is misplaced.

NSR's reliance on *Haas v. Wyoming Valley Health Care System*, 553 F.Supp. 2d 390 (M.D.Pa. 2008), and *Onken v. McNeilus Truck & Manufacturing., Inc.*, 639 F.Supp. 2d 966 (N.D. Iowa 2009), is also misplaced.   NSR cites these decisions for the general proposition that where the employee's disability poses an objective direct threat to the health and safety of others, an employee is not otherwise qualified under the ADA.   NSR failed to provide any analysis of these decisions or explain how they apply to the case at bar.   A close examination of the courts' decisions in *Haas* and *Onken* reveals that the direct threats posed by the employees' impairments in those cases were clearly established by the objective evidence, unlike the case at bar.   For example, in *Haas,* an orthopedic surgeon, who experienced a bipolar episode during surgery, brought a disability discrimination claim when his employer failed to remove a condition for reinstatement of his operating privileges.   *Haas,* 553 F.Supp. 2d at 393-94.   In defense of the discrimination charge, the employer raised a direct threat argument. The court, upon consideration of the four factors enunciated by the Supreme Court in *Arline*, ruled that no reasonable juror could conclude that the physician did not pose a direct threat to the health and safety of his patients. The court concluded, therefore, that the hospital's disparate treatment of

the physician, by requiring that he be supervised by another orthopedic surgeon, was permissible. *Id.* at 402.   In reaching this conclusion, the court focused on the probability of the risk occurring, and found that the record contained numerous facts to show that such an episode could potentially occur again.   *Id.* at 401.   The record evidence in *Haas* also showed that the employer considered the nature, duration and severity of the risk to patients when it made its decision imposing conditions on the physician's return to work.   *Id.*   By contrast here, NSR conclusively states that the record evidence supports each of the factors, but failed to point to the specific evidence that supports each factor. Moreover, unlike the case at bar, it was clear in *Haas* that the surgeon's bipolar disorder posed a significant risk of harm.

Similarly in *Onken,* the employer's direct threat defense was supported by substantial objective evidence.   In that case, the employer, a welder, was terminated after his employer determined that his diabetic condition posed a direct threat of harm to the health and safety of its employees, and there were no other jobs that plaintiff was capable of performing due to his frequently recurring hypoglycemic episodes.   *Onken,* 639 F.Supp. 2d at 976-77.   The objective evidence of a direct threat included testimony from the plant's safety supervisor about the potential danger of allowing someone who was staggering to be present on the production floor; plaintiff's admissions that when he was hypoglycemic, he was unable to control his actions, and he occasionally suffered from seizures and lost consciousness; testimony from a witness who observed plaintiff staggering near his work station on the plant floor; and plaintiff's medical records showing that he continued to experience profound hypoglycemic episodes after his termination. *Id.* at 979. The objective evidence also included the results of a fitness for duty evaluation that the plaintiff underwent at the request of the employer, after a hypoglycemic episode that resulted in plaintiff being placed on leave.   That evaluation showed that the plaintiff

posed a serious safety risk, in that plaintiff lacked the ability to determine when the hypoglycemic episodes were coming on with the immediacy necessary to take corrective action, and that because hypoglycemia can impair an individual's ability to make appropriate or sound judgments, it was reasonable to opine that if plaintiff continued to have these episodes, he was a risk to himself and possibly to others. *Id.* at 976. In stark contrast here, there is little objective evidence to support NSR's direct threat defense.

The medical evidence, viewed in the light favorable to Gaus, indicates that Gaus was not experiencing any serious side effects from his medications. The medical records from Advanced Pain Medicine from February 2009 through June of 2010 indicate that, with one exception, Gaus did not experience any side effects from his medications. The only exception was a notation on the August 12, 2009 office notes from Advanced Pain Medicine that Gaus was experiencing some grogginess and sedation, but it was unclear whether his grogginess and sedation was due to his medication or because he was not sleeping due to the pain or possibly from a previous parvovirus infection.

The medical evidence reflects that the physician, who was retained by NSR to conduct the return to work examination in July 2008, released Gaus to return to work without restriction. Dr. Schogel, his primary care physician, released Gaus to return to work without restriction in July and August 2008, and again in January 2009. Dr. Schogel, in response to a questionnaire sent by the NSR Medical Department on January 29, 2009, considered the effects of his chronic pain condition, fatigue and sleep apnea on his ability to perform his duties as an electrician, and reported that with regard to his sleep apnea, he was compliant and had improved daytime wakefulness; she also reported that his fatigue was improved for more than six weeks. Dr. Schogel reported that Gaus' current pain level in January 2009 was a 4 or 5 out of 10; she

deferred to his pain management doctor as to the stability and control of his pain, and did not respond to the question whether Gaus' narcotic use (if any) was consistent with NSR's medication guidelines.  In addition, four other treating physicians—Doctors Bergman, Byers, Gardner, and a doctor from Greater Pittsburgh Orthopedic Associates—released Gaus to return to work in August 2008 without restrictions with regard to the conditions for which they were treating him.

Dr. Fischer evaluated Gaus' cognitive functioning in March 2009 and found he was "as competent as ever."  (Def's CSMF, Ex. 54 , ECF No. 28-8.)  NSR attempted to discredit Dr. Fischer's report by arguing that Dr. Fischer did not consider the impact of Gaus' medications on his cognitive functioning.  This argument is unavailing because the medical records indicate that Gaus was taking his narcotic pain medication at the time of the cognitive testing.

Other objective evidence in the record consists of Gaus' testimony at his deposition that from February 2009 through August 2009 when he was receiving treatment from the physicians at Advanced Pain Medicine, notwithstanding the pain medication and the pain he was experiencing, he was "quite sure [he] could have [done his job], because most of [his] pain was at night.  And [he] was resuming normal activities at home, [he] was lifting weights two hours a day, bench pressing over 400 pounds, working with the children on a daily basis, driving them back and forth to where they needed to go, plus making periodic repairs on [his] home."  (Def.'s App., Ex. 1 at 97, ECF No. 28-2.)

On the other hand, NSR appears to be relying primarily on Dr. Lina's review of the medical records described above, Dr. Lina's one-time telephone conference with Gaus in August 2008, and NSR's medical guidelines, as evidence that Gaus posed a significant risk of substantial harm.  Dr. Lina did not personally examine Gaus or ask him what effects, if any, his pain and

medications had on his ability to perform the duties of electrician.  Dr. Lina did not address or even acknowledge the notations in the medical records to the effect that Gaus denied any side effects from his medications.  There was no evidence that side effects would always occur in a patient or that they would necessarily be present in Gaus' case.  Consequently, a reasonable jury could find that Dr. Lina's medical judgment was not reasonable as it was not based on the objective evidence.

NSR's medication guidelines are not objective evidence of a significant risk of substantial harm.  These guidelines indicate <u>generally</u> the amount of time that must elapse between the last dosage of certain narcotic medications, including Opana ER and Lyrica, and the start of the employee's work shift.  These guidelines do not take into account a particular employee's reaction, or lack thereof, to the medication.  This runs counter to NSR's Medical Department Return to Work Information Sheet, which suggests that an individual assessment will be made.  It provides that individuals may not work in nonsedentary or safety-sensitive positions *if they are experiencing side effects* such as "sedation, sleepiness, weakness, fatigue, and/or impairment of judgment, reflexes, balance and coordination[.]"  (Pl.'s App., Ex. 2, ECF No. 36-2.)

In opposing NSR's direct threat argument, Gaus argues that an issue of fact exists about whether NSR conducted an individualized assessment of his ability to perform the essential functions of his electrician position, and whether he posed a direct threat to himself and others in the work place.  Given that all of Gaus' physicians, as well as NSR's physician, released him to return to work without restriction, and the psychological testing performed by Dr. Fischer showed he could perform the duties of his position, Gaus submits that a material issue of fact exists about whether he posed a direct threat to himself or others.  The court agrees.  In support,

Gaus relies on two decisions from this district, *Conto v. Norfolk Southern Corp.,*Civ. A. No. 05-1509, 2007 WL 4370906 (W.D.Pa. Dec. 11, 2007),[19] and *Hussey*.  In both decisions, the court found that material issues of fact existed about whether the employer sufficiently performed an individualized assessment of the employee's ability to perform the job.

In *Conto,* the same representatives of Defendant's medical department, Doctors Prible and Lina, were involved in the decision to disqualify medically Conto from his safety-sensitive position of machinist, because of his use of a prescription narcotic medication to treat an impairment that caused significant pain was outside of its medical guidelines. 2007 WL 4370906, at **15-16.  In *Conto,* NSR argued that it had conducted an individual assessment into the employee's ability to perform the essential functions of his job, because Dr. Lina had personally reviewed the employee's medical records, discussed the essential functions of the machinist job with one of his supervisors, spoken to the employee's treating physician, and spoken with the doctor who performed his pre-employment physical, before determining that the employee was not medically qualified to perform the machinist job.  *Id.*, at *16.   The court found that material issues of fact existed about whether Dr. Lina's personal review of the employee's medical records and her discussion with his physicians, instead of personally performing an assessment of the employee, amounted to an individualized assessment as required by the ADA.  In so holding, the court noted that the employee's treating physician testified that she would have wanted the employee to have undergone a functional capacity test, with an alertness component, to see if he was able to perform the duties of the machinist job.  *Id.*  Consequently, the court denied NSR's motion for summary judgment.

---

[19] In *Conto,* the adequacy of the individualized assessment was determined only with respect to whether the employee could perform the essential functions of the job; the employer did not raise a direct threat argument in that case.

Similarly in *Hussey*, the court found material issues of fact existed about whether an adequate individualized assessment had been conducted by the employer, both with respect to whether Teaford could perform the essential functions of the job, and to whether his methadone use posed a direct threat to the safety of others. *Hussey*, 696 F.Supp. 2d at 518, 520-21.  In that case, Teaford underwent a pre-employment physical and was disqualified from a safety-sensitive production laborer position in a copper mill because of his prescription methadone use to treat an opiate addiction.   The medical director of the occupational medical facility retained by Hussey to provide pre-employment physicals recommended that Teaford not perform safety-sensitive work due to his medications.  *Id.* at 509.  The medical director, however, did not meet with or personally examine Teaford, but based his opinion on the nurse practitioner's evaluation and his knowledge gained from various literary sources about methadone.  *Id.* at 518.  The medical director did not speak with Teaford's prescribing physician either.  *Id.*  In addition, the medical director did not ask Teaford about his own experience with the methadone's effect on cognitive functions, even though he questioned him about why he failed to disclose his methadone use. There was no evidence in the record to show that Teaford had ever experienced any side effects related to his methadone use or that the medical director ever inquired of the nurse practitioner, Teaford's treating physician or counselor about whether Teaford ever demonstrated any cognitive deficits – even though they all had the opportunity to observe Teaford while he was on methadone.  *Id.*  The medical director acknowledged that a neuro-cognitive examination was available to assess Teaford's ability to perform safely the job, and although he had used such a test previously, he elected not to use it in that case.  Under these circumstances, the court concluded that Hussey had merely "speculate[d] as to the possible safety concerns which could have arisen if Teaford were employed, without any indication that Teaford's methadone use

actually impeded his ability to safely perform as a production laborer[,]" and therefore, material issues of fact existed. *Id.* The court further found that in light of these facts and the relevant federal guidelines and regulations, the physical examination by the nurse practitioner and review by the medical director did not constitute an individualized assessment as mandated by 29 C.F.R. §1630.2(r)(2011), and thus, Hussey's decision that Teaford was a direct safety threat was not objectively reasonable. *Id.* at 521. Accordingly, the court concluded that Hussey failed to establish as a matter of law that Teaford posed a direct threat. *Id.*

This court finds the rationales of *Hussey* and *Conto* persuasive. In the instant matter, evidence exists in the record from which a reasonable jury could find that NSR failed to conduct an individualized assessment of Gaus' ability to perform the essential functions of the electrician position and into whether Gaus posed a direct threat of harm or safety to others in the workplace. The evidence shows that Dr. Lina spoke with Gaus on only one occasion, and at no time during that conversation did she inquire about the physical or mental side effects, if any, of the narcotic pain medication on him. Although Dr. Lina reviewed the reports of Gaus' treating physicians, in particular the office notes from Advance Pain Medicine, she did not acknowledge Gaus' reported lack of side effects from the narcotic pain medications. Similarly, Dr. Lina appears to have ignored Dr. Fischer's opinion following the administration of cognitive tests in March 2009, as well as the recommendation of the physician who conducted a return to work evaluation in July 2008. Instead, Dr. Lina appears to rely, almost exclusively, on Gaus' narcotic medications falling outside NSR's medical guidelines. Dr. Lina did not personally examine Gaus. Consequently, a reasonable jury could find that Dr. Lina's conclusion that Gaus posed a direct safety threat was not the type of "individualized assessment" required by the federal regulations. *See EEOC v. Burlington N. & Santa Fe Ry. Co.,* 621 F.Supp.2d 587 (W.D. Tenn. 2009)

(employer's determination that employee was unable to work as a conductor, based on opinions of doctors who never observed him or conducted a physical examination, was not the type of individualized assessment required by 29 C.F.R. §1630.2(r)(2011)); *see Onken,* 639 F.Supp. 2d at 980-81 (finding that employer properly performed individualized assessment of the factors contained in 29 C.F.R. §1630.2(r)(2011)), where employer based its decision on the thorough fitness for duty evaluation, as well as the facts contained in an incident report regarding plaintiff's last hypoglycemic episode at work).   Moreover, the Equal Employment Opportunity Commission's interpretative guidance provides that in determining whether a direct threat exists, relevant evidence "may include input from the individual with the disability, the experience of the individual with a disability in similar positions, and opinions of medical doctors, rehabilitation counselors, or physical therapists who have expertise in the disability involved and/or direct knowledge of the individual with the disability."   29 C.F.R. pt. 1630, app. §1630.2(r)(2011).

NSR attempts to distinguish *Hussey* in three respects.  First, NSR posits that the laborer position in *Hussey* is notably different from Gaus' electrician position.  While the positions are functionally different, these both are safety-sensitive positions.  Each involves a significant risk of substantial harm *if* the employer established through an individualized assessment of the objective evidence that the employee's impairments affected his ability to safely perform the essential functions of his job.   A question of fact, however, exists about whether a proper individualized assessment was conducted here.   Second, NSR argues that while the safety concerns in *Hussey* were speculative or remote, here the evidence of record shows that the potential harm to Gaus or others in the workplace was of sufficient duration, severity and likelihood to warrant NSR's concern that the likelihood of harm was imminent.  NSR contends

that the side effects associated with the use of Opana ER and Lyrica are documented and there is no question about the imminent harm associated with the operation of a diesel locomotive by someone who is not alert or whose senses are otherwise compromised.  This court has already found that contrary to NSR's contention, the record here does not contain objective evidence showing that Gaus – in fact – had side effects from his medication that implicated potential harm of sufficient duration and likelihood to warrant a concern that the likelihood of harm was imminent.  Finally, NSR disagrees with the ruling in *Hussey* to the extent it held that an employer's physician must personally examine the employee to satisfy the individualized assessment requirement.  NSR misconstrues the holding in *Hussey*, as well as the applicable regulation.  The Equal Employment Opportunity Commission's interpretative guidance makes clear that 29 C.F.R. §1630.2(r)(2011) does not require that the employer's physician personally examine the employee.  What is required, however, is that the employer base its determination of a direct safety threat on objective evidence from physicians or other medical professionals who have observed or examined the employee, and/or direct input obtained from the employee.  29 C.F.R. pt. 1630, app. §1630.2(r) (2011).  In the case at bar, NSR did not base its determination of a direct safety threat on any such evidence.

Gaus' final argument in opposition to NSR's direct threat defense is that NSR's blanket application of its medical guidelines runs afoul of the individualized assessments required by the ADA.  As Gaus points out, the ADA "makes it clear that blanket exclusions are to be given the utmost scrutiny, and are, as a general rule, to be discouraged."  *Bombrys v. City of Toledo,* 849 F.Supp. 1210, 1219-20 (N.D.Ohio 1993) (holding blanket exclusion preventing insulin-dependent diabetics from becoming police officers violated ADA); *see Stillwell v. Kansas City, Mo. Bd. of Police Comm'rs,* 872 F.Supp. 682, 686-87 (W.D.Mo.1995) (holding that an across-

the-board exclusion of all one-handed applicants for private security guard license by simply assuming that they cannot meet the physical eligibility requirements "runs afoul" of the required individualized assessment); *Sarsycki v. United Parcel Serv.,* 862 F.Supp. 336, 341 (W.D.Okla.1994) (finding that blanket UPS regulation that barred insulin-dependent diabetics from driving motor vehicles under 10,000 pounds, without consideration of the individual's specific limitations or whether a reasonable accommodation was available, was impermissible). The Supreme Court has made clear that

> an individualized inquiry . . . is essential if § 504 [of the Rehabilitation Act] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks.

*Arline,* 480 U.S. at 287.[20]

In support of his argument, Gaus relies on *EEOC v. Chrysler Corp.*, 917 F.Supp. 1164 (E.D. Mich. 1996). In that case, the plaintiff argued that the employer's policy of not authorizing employment for an individual with a blood sugar level of greater than 140 mg/dl constituted a blanket exclusion which violated the ADA's individualized assessment requirement. *Chrysler Corp.*, 917 F.Supp. at 1172. The court in *Chrysler Corp.* noted that in both *Bombrys* and *Stillwell,* the courts "emphasize[d] the ADA's requirement of a case-by-case analysis of disabled individuals 'to *accurately* determine what risks, if any, they pose to themselves or the public.'" *Id.* (quoting *Stillwell,* 872 F.Supp. at 687). The court noted that individualized assessments were absolutely necessary to protect individuals with disabilities from unfair and inaccurate stereotypes and prejudices, and that the courts have "stress[ed] that blanket exclusions 'are to be

---

[20] "Case law analyzing the Rehabilitation Act, after which the ADA is modeled, is used to interpret the ADA." *Chrysler Corp., 917* F.Supp. at 1168 n.1 (citing *Sarsycki v. United Parcel Serv.,* 862 F.Supp. 336, 341 n. 2 (W.D.Okla.1994)), *rev'd on other grounds,* 172 F.3d 48 (6th Cir. 1998).

given the utmost scrutiny,' *Bombrys,* 849 F.Supp. at 1219-20, and are 'highly suspect.' *Stillwell,* 872 F.Supp. at 686." *Id.* The employer in *Chrysler Corp.* attempted to argue that each individual applicant was examined for the particular position's requirements and that medical standards were used only as a guide. The court rejected this argument, finding that the evidence failed to show that the employer performed individualized assessments of its applicants; rather, the evidence revealed that the employer relied primarily on a number which represented the individual's blood sugar level. The employer did not consider the applicant's medical history to determine his or her real ability to perform the job. The court concluded that this blanket exclusionary policy violated the ADA. *Id.*

Similarly here, Gaus argues, NSR's application of a blanket ban from working in safety-sensitive and nonsedentary positions, on all employees who are taking certain narcotic medications, is contrary to the ADA's requirement that assessments be made on an individualized basis. Based upon the record, the court agrees with Gaus. There was no objective evidence of record that Gaus experienced the kind of side effects described in NSR's medication guidelines. The objective evidence here indicates that Dr. Lina did not perform an individualized assessment about whether Gaus' use of narcotic pain medications impaired his ability to perform the duties of his electrician position. Gaus contends that Dr. Lina did not question him at any time about any side effects he experienced from his medications or about any functional limitations he had due to his chronic pain. Dr. Lina did not conduct an examination of Gaus. It is clear from her correspondence with Gaus that she medically disqualified him because his pain medications were outside NSR's medical guidelines. Based on these facts, the court finds that a reasonable jury could conclude that Dr. Lina failed to perform an individualized assessment as required under the ADA.

> **d.      Whether NSR's Medical Guidelines Are**
> **Consistent with Business Necessity**

For its final argument in support of summary judgment, NSR submits that although its medical guidelines prevented Gaus from working for a period of time, the guidelines constitute a lawful business necessity in light of the safety-sensitive nature of his duties.  NSR maintains that while the ADA prohibits an employer from applying a qualification standard that screens out or tends to screen out disabled persons, it also affords an employer an affirmative business necessity defense to claims challenging the application of an otherwise problematic standard, citing 42 U.S.C. §§12112(b)(6), 12113(a).

The ADA provides an affirmative defense to a charge of discrimination involving the application of a qualification standard that would screen out or otherwise deny a job or benefit to an individual with a disability if an employer can show that standard is job-related and consistent with business necessity, and such performance of the job cannot be accomplished by reasonable accommodation.  42 U.S.C. §12113(a).

> Business necessity is closely akin to job relatedness and the terms are often interchanged. Job relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions. Business necessity is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria in hiring or promotional decision making.

*Hamer v. City of Atlanta,* 872 F.2d 1521, 1533 (11th Cir. 1989).

The Third Circuit Court of Appeals has set forth the applicable standard to determine whether an employer may invoke the business necessity defense:

> [A] factfinder must face the same concerns that the Supreme Court addressed in *Arline* about the nature of the risk, the duration of the risk, the severity of the risk, and the probabilities that the disability will cause harm. *See Arline*, 480 U.S. at 287, 107 S.Ct. 1123. For a safety qualification to meet the business necessity defense, it must

> be based on current medical knowledge about the disability and on the real risks that the disability may present. Any jury considering this defense should be instructed not to base its determination on unfounded fears, but only on medically accurate facts. Even an employer's good faith actions will not save him if the employer is misinformed about the realities of the disability. In such a case, the jury should "assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments." *Bragdon v. Abbott*, 524 U.S. 624, 650, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

*Verzeni v. Potter,* 109 F. App'x 485, 491-92 (3d Cir. 2004). The employer bears the burden of proving that its qualification standard satisfies the business necessity defense, which "'is quite high, and is not to be confused with mere expediency.'" *Indergard v. Georgia-Pacific Corp.,* 582 F.3d 1049, 1057 (9th Cir. 2009) (quoting *Cripe v. City of San Jose,* 261 F.3d 877, 890 (9th Cir. 2001)). Once the employer meets its burden of showing that the qualification standard at issue is job-related and consistent with business necessity, the burden then shifts to the employee to show that a reasonable accommodation exists that would satisfy the qualification standard. *Moses v. Am. Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir. 1996).

In attempting to show that its medical guidelines satisfy the business necessity defense, NSR argues that its guidelines are based on current medical knowledge of the medications and the real risks associated with the use of such medications. NSR contends that the potential side-effects of Opana ER and Lyrica are documented and undisputed, as is the safety-sensitive nature of Gaus' position. NSR submits that the risks associated with allowing an individual to perform the tasks associated with the electrician position while under the influence of medications prohibited by the guidelines are great. Thus, NSR contends that it is entitled to the affirmative defense of business necessity. NSR does not cite any evidence or authority in support of this argument.

In response, Gaus takes issue with NSR's argument that its medical guidelines are based on current medical knowledge of Opana ER and Lyrica, and that the side effects of those medications are documented and undisputed. Gaus argues that given that numerous medical professionals released him to return to work as an electrician while he was taking Opana ER and Lyrica, a reasonable jury could certainly conclude that NSR's medical guidelines are not objectively reasonable. Gaus argues that NSR failed to offer anything but mere speculation about the probability that allowing an electrician to work on a locomotive would cause harm, and the business necessity defense cannot be predicated on such unfounded fears, citing *Verzeni,* 109 F. App'x at 491. Therefore, Gaus submits that NSR failed to meet its "high standard" of proving business necessity.

Applying the standard set forth in *Verzeni* to the facts of this case, the court concludes that NSR failed to show that its application of its medical guidelines is consistent with business necessity. Even NSR's guidelines refer to "in general" – implying not always – and individuals "experiencing such side effects" – implying not all individuals experience such side effects. (Pl.'s App. Ex. 2 attached to Ex. 14, ECF No. 36-2). The guidelines themselves contemplate the need for specific assessment of the individual. In essence, the factors delineated in *Verzeni* are the same as those considered under the direct threat defense. As this court already evaluated those factors at length and determined that material issues of fact exist about whether NSR's determination that Gaus posed a direct safety threat was objectively reasonable, the court reaches the same conclusion with regard to the business necessity defense. NSR advances the barest of arguments, which falls way short of its burden. Accordingly, the court finds that NSR is not entitled to summary judgment in its favor on the business necessity defense.

## IV. *Conclusion*

The court is not unsympathetic to NSR's concerns with safety in the workplace, and recognizes that employers must be able to use reasonable means to evaluate the safety of the work environment without exposing themselves to ADA claims.  A material question of fact exists, however, about whether NSR showed that Gaus' chronic pain condition and medication regiment posed a direct threat to employee safety.  Therefore, on the summary judgment record, the court cannot find in favor of NSR with respect to the conduct or events after January 1, 2009.

For the reasons set forth above, the court finds that material issues of fact do not exist with respect to the conduct or events occurring prior to January 1, 2009, and therefore, the court will grant defendant's motion for summary judgment as to that portion of plaintiff's claim.  The court, however, finds that material issues of fact exist about the events occurring on or after January 1, 2009, thereby precluding summary judgment for conduct or events thereafter.  The court will deny defendant's motion for summary judgment with respect to that portion of plaintiff's claim.

An appropriate order will follow.


Dated:  September 28, 2011                    By the court:

                                              /s/ JOY FLOWERS CONTI
                                              JOY FLOWERS CONTI
                                              United States District Judge